UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ADRIENNE DENISE CUFFIE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CAROLYN W. COLVIN,[1] )<br>ACTING COMMISSIONER, SOCIAL )<br>SECURITY ADMINISTRATION, )<br>)<br>Defendant. )<br>) | Civil Action No. 12-cv-30140-DJC |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                                                    **September 25, 2013**

**I.     Introduction**

Plaintiff Adrienne Denise Cuffie ("Cuffie") filed claims for disability insurance benefits ("SSDI") and supplemental security income ("SSI") with the Social Security Administration ("SSA"). Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Cuffie brings this action for judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of the SSA ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on July 15, 2011, denying Cuffie's claims. Before the Court are Cuffie's Motion for Judgment on the Pleadings, D. 12, seeking reversal of the ALJ's decision

---

[1] During the pendency of this litigation, Ms. Colvin became the Acting Commissioner of the Social Security Administration. The Court therefore substitutes Ms. Colvin as the defendant in this matter.

and the Commissioner's motion to affirm that decision, D. 19. Cuffie argues that the ALJ erred in denying her claims because the ALJ failed to give the proper weight to a treating physician's medical opinion and failed to provide an adequate explanation for doing so. For the reasons stated below, the Court GRANTS the Commissioner's motion to affirm and DENIES Cuffie's motion for judgment on the pleadings.

## II.     Factual Background

Cuffie was forty-one years old when she ceased working in June 2009. R. 176-77.[2] She had previously served as a Certified Nurse Assistant ("CNA"). R. 21. In her September 28, 2009 application for SSDI and SSI with the SSA, Cuffie claimed disability due to a motor vehicle accident on June 25, 2009 that left her with back and neck pain that rendered her unable to work. R. 176, 285.

## III.    Procedural Background

Cuffie filed claims for SSDI and SSI with the SSA on September 28, 2009 asserting that she was unable to work as of June 25, 2009. R. 176. After initial review, her claims were denied on February 18, 2010. R. 108. On March 15, 2010, Cuffie filed a request for reconsideration. R. 116. Her claims were reviewed by a Federal Reviewing Official and again denied on May 25, 2010. R. 118-123. On May 28, 2010, Cuffie filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 124-125. A hearing was held before an ALJ on May 10, 2011. R. 13-65. In a written decision dated July 15, 2011, the ALJ found that Cuffie was not disabled within the meaning of the Social Security Act and that she had sufficient residual functional capacity to perform light work. R. 84-107.

---

[2] "R." refers to the administrative record that is entered at D. 10.

On August 15, 2011, Cuffie requested that the Appeals Council ("AC") review her claims. R. 12. On June 1, 2012, the AC denied Cuffie's request for review of the ALJ's decision. R. 1. Accordingly, the ALJ's decision is the Commissioner's final decision.

## IV.   Discussion

### A.   Legal Standards

#### 1.   *Entitlement to Disability Benefits and Supplemental Security Income*

A claimant's entitlement to SSDI and SSI turns in part on whether she has a "disability," defined in the Social Security context as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A); see also 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. The inability must be severe, rendering the claimant unable to do her previous work and any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505–404.1511.

The Commissioner must follow a five-step process when determining whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted. 20 C.F.R. § 416.920. All five steps are not applied to every applicant; the determination may be concluded at any step along the process. Id. First, if the applicant is engaged in substantial gainful work activity, then the application is denied. Id. Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied. Id. Third, if the impairment meets the conditions for one of the "listed" impairments in the Social Security

regulations, then the application is granted. Id. Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied. Id. Fifth and finally, if the applicant, given his or her RFC, education, work experience and age is unable to do any other work within the national economy, the application is granted. Id.

### 2. *Standard of Review*

This Court has the power to affirm, modify, or reverse a decision of the Commissioner. 42 U.S.C. § 405(g). Such review is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence." Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000) (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). The ALJ's findings of fact are conclusive when supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)) (internal quotation marks omitted).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen, 172 F.3d at 35 (citations omitted). Thus, if the ALJ made a legal or factual error, Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citation omitted), the Court may reverse or remand such decision to consider new material evidence or to apply the correct legal standard. See 42 U.S.C. § 405(g).

**B.     Before the ALJ**

*1.     Medical History*

There was extensive evidence about Cuffie's medical history before the ALJ, particularly in regard to Cuffie's history of back pain and depression.

a.     Back Pain

On June 25, 2009, Cuffie was the passenger in a motor vehicle that was "side-swiped" on the passenger side. R. 294. On the same day, Cuffie was admitted at Mercy Medical Center in Springfield and diagnosed with an acute cervical and lumbar spasm. R. 295. The hospital discharged Cuffie that day advising her to return to work on June 27, 2009 and prescribing her Vicodin, Ibuprofin and Flexeril. Id. On June 29, 2009, Dr. Michael Levesque began chiropractic treatment of Cuffie. R. 502. At this point, Cuffie was still in a significant amount of pain, causing her to be "guarded and restricted" upon examination. Id. On July 31, 2009, Cuffie was treated by Daniel Schwartz, P.A. at Pioneer Spine and Sports Physicians, Inc. ("Pioneer"). R. 321. Schwartz determined that Cuffie was suffering from back pain, but that at that time, the pain was not radiating to her lower extremities. R. 322. He further reported that Cuffie had limited range of motion in the cervical and lumbar regions, but noted that disc spaces were "all well preserved" and that the lumbar spine "had no significant disc height abnormalities." Id. Schwartz advised her that she could return to work on August 3, 2009 as long as she did not lift over five pounds and avoided squatting, kneeling and bending. R. 324. On August 3, 2009, Dr. Levesque opined in an "Initial Disability Claim Form" that Cuffie had suffered lumbar strain with muscle spasms, causing Cuffie to be unable to perform essential job functions. R. 528.

On September 4, 2009, Cuffie had a follow up appointment with Schwartz. R. 326. He

reported improvement with regard to pain in the cervical area, but noted that Cuffie's pain continued to prevent her from working.  Id.  Schwartz also noted that Cuffie was "fairly aggressive in her exercise program" and that, accordingly, her weight reduction program was proving to be successful.  R. 327.  In addition, Schwartz reported that "lumbar flexion is well-tolerated" and there was "no atrophy or strength deficits in the lower extremities." Id.  Schwartz stated that Cuffie could return to work and could only "lift[] no greater than 100 pounds with a second assist" but that "[i]ndependently the patient elected to 30 pounds."  R. 541.  Schwartz also recommended that she be provided with opportunities to change position and only work 8 hours per day for four days per week for the next three weeks.  Id.

On September 12, 2009, Cuffie met with Dr. Thomas Gartman.  R. 367.  Although Cuffie reported back pain radiating into the left buttock, she reported no weakness, numbness, tingling or bladder dysfunction.  Id.  Dr. Gartman reported that Cuffie was "ambulating stooped forward," but that "muscle strength is normal in the lower extremities," and concluded that the low back pain was "without neurologic deficits."  R. 369.

On September 23, 2009, Dr. Rae Davis, also of Pioneer, evaluated Cuffie.  R. 329.  As Cuffie reported severe "10/10" pain, Dr. Davis ordered an MRI.  Id.  In reviewing an earlier MRI, Dr. Davis noted "I cannot explain why she is in this much pain."  R. 330.  The updated MRI revealed a mild disc bulge limited to the L5-S1 level along with a mild disc degeneration in the same location, although reporting "no deformity of the thecal sac or displacement nerve roots."  R. 332.  After receiving these results, Dr. Davis ordered that Cuffie could return to light duty on October 14, 2009 with no lifting greater than 50 pounds repetitively or 100 pounds occasionally.  R. 333.

At a follow up evaluation on October 27, 2009, Dr. Davis reported that Cuffie's right leg pain improved, but still reported significant lower back pain. D. 334. At that time, Dr. Davis reported "no sensory loss or muscular weakness in the lower extremities," but noted that "weightbearing activity or repetitive bending can exacerbate her pain." Id. Dr. Davis also pointed out that Cuffie "refused to perform lumbar flexion due to anticipation of pain," but in commenting on Cuffie's MRI results, noted that she suffered only from a "mild disc bulge" and that return to light duty was appropriate. Id.

Roughly one month later, on November 30, 2009, Dr. Davis reported that Cuffie's leg pain was gone and that her back pain was now only "8/10." R. 348. At this appointment, Cuffie reportedly asked for a referral to an orthopedic surgeon, but Dr. Davis informed her that he did not believe she was a surgical candidate. R. 349. At this time, however, Cuffie did, however, receive an epidural spinal injection. Id.

Then, on January 7, 2010, Cuffie informed Dr. Charles Mick at Pioneer that her leg pain had returned and back pain had increased. R. 351. However, the examination revealed "modest reversal of lumbar lardosis." Id. On February 4, 2010, Dr. Ron Paasch at Pioneer evaluated Cuffie and discussed her surgical options. Dr. Paasch wrote that Cuffie "continues to be in severe pain," but that she rated her pain at "6-10." R. 353.

On July 9, 2010, Cuffie presented to the Emergency Room at Baystate Medical Center with an exacerbation of chronic lower back pain and sciatica. R. 591. Treating physicians at Baystate prescribed Percocet and Motrin. R. 592.

On July 12, 2010, Dr. Kelly Armstrong at Pioneer evaluated Cuffie, who reported "7/10" pain and trouble walking. R. 563. Armstrong reported, however, that Cuffie was "in no acute

distress." R. 565. Nonetheless, Dr. Armstrong stated that the pain was severe enough for Cuffie to be considering back surgery. R. 566. Dr. Armstrong ordered an MRI, the results of which were reported on July 29, 2010. R. 571. The MRI revealed disc desiccation at L5-S1, mild loss of disc height and posterior osteophyte disc complex, but concluded only that the L5-S1 endplate edema was "possibly degenerative or posttraumatic." Id.

On December 7, 2010, Dr. Armstrong evaluated Cuffie and noted prior reports of "10/10" pain, but opined that "she does not appear to be in '10/10' pain in that she's moving about without guarding, however pain is very subjective." R. 608. During the same examination, Dr. Armstrong reported that Cuffie "walks about agily and moves about the exam table without guarding," noting that flexion became painful at 60 degrees, but that her bilateral ankles and large toe extension were strong. R. 610. Notably, Dr. Armstrong stated that she could not find "any appreciable change" in her L5-S1 discogenic problems in comparing her MRI results from before the June 25, 2009 motor vehicle accident to results of MRI examinations conducted after the accident. R. 611.

At some unknown date, but before February 8, 2011, the date of Cuffie's surgery, Dr. Armstrong completed a "Physical Residual Functional Capacity Questionnaire," (the "Questionnaire"). R. 618. Dr. Armstrong revised her opinion with regard to Cuffie's functional capacity, noting that Cuffie was only able to walk one half of one block, sit 45 minutes at a time, could stand 30 minutes at a time and lift 10 pounds. R. 619-20. Dr. Armstrong also opined that Cuffie could not sit and stand or walk more than 2 hours in an 8 hour work day. R. 620.

On January 10, 2011, Cuffie met with Natasha McKay of New England Neurological Associates. R. 641. Upon review of her MRI results, Dr. McKay recommended that Cuffie

undergo anterior lumbar interbody fusion surgery. Id. On February 8, 2011, Cuffie had spinal fusion surgery. R. 649. Dr. McKay was the principal operative surgeon. Id. Approximately two weeks later, on February 18, 2011, Cuffie had a follow up appointment with New England Neurological Associates. R. 640. Cuffie reported that the surgery had ameliorated her leg pain. Id. Thomas McDowell, P.A. in conjunction with Dr. McKay also reported that Cuffie "ambulated without difficulty" and demonstrated "strength in all major muscle groups." Id. Cuffie had a second post-operative appointment with Dr. McKay on April 4, 2011. R. 695. Cuffie reported that she was "walking the mall" regularly, but that carrying heavier weights continued to cause back strain. Id. However, Dr. McKay opined, "I think she is doing well," and stated that Cuffie "now needs to challenge herself a little bit, start weaning out of the brace and using small hand weights to build up her back strength." Id.

      b.     Depression[3]

On September 30, 2009, Dr. Howard Singer reported that Cuffie indicated "[n]o mood disorder or recent psychosocial stressors." R. 302. On September 7, 2010, Gina Hughes of the Center for Psychological and Family Services evaluated Cuffie. R. 557. Although this report is handwritten and largely illegible, it appears that Dr. Hughes found that Cuffie may have been suffering from adjustment disorder. R. 558. As part of her application for disability benefits, the record reflects a letter from her psychotherapist, Dr. John Cymer, dated April 20, 2011. R. 696. In this letter, Dr. Cymer reported that Cuffie was attending psychotherapy on a biweekly basis and that he had prescribed Cuffie with Wellbutrin and Ambien. Id. Nonetheless, other clinicians have found Cuffie to be "alert and oriented" and "in a euthymic mood" with a "positive

---

[3] Cuffie does not challenge the ALJ's findings relative to Cuffie's mental health.

outlook." R. 348, 671.

    *2.*    *ALJ Hearing*

At the May 10, 2011 administrative hearing, the ALJ heard testimony from Cuffie and a vocational expert ("VE"), Larry Takki.

    a.    Cuffie's Testimony

Cuffie testified that she had been disabled since her June 25, 2009 car accident. R. 25. Cuffie testified that her physicians believed that she had suffered from back problems prior to the accident but that the accident may have aggravated her problems. R. 27. She stated that she had had fusion surgery and that she was still recovering from her surgery and was able to walk, but could not do any lifting. R. 25. Cuffie stated that although the surgery "significantly" ameliorated her back pain, there were still many days in which she was in "a lot" of pain. R. 38. She noted that doing too much walking aggravates her pain. R. 41. She further testified that she rated her pain at about a 7 or 8 and has only 10-15 "good days" per month and could comfortably lift about seven pounds. R. 42, 44. Finally, Cuffie testified that she "mall-walks" two to three times per week for exercise. R. 47.

Cuffie also testified that other conditions affected her ability to work, including her diabetes, hypertension, high cholesterol and anxiety. R. 29.

    b.    VE's Testimony

The VE testified that he had an opportunity to review Cuffie's written vocational records prior to the hearing. R. 56. The ALJ asked the VE whether there are any jobs that are consistent with Cuffie's past work that could be performed for an individual who can stand, walk a maximum of two hours, avoid balancing and kneeling and avoid concentrated exposure to

extreme cold and even moderate exposure to hazards. R. 57. In response, the VE testified that Cuffie could perform as a toll collector, parking lot attendant or in small product assembly. R. 57-58. The ALJ asked the VE whether there are any jobs that are consistent with Cuffie's past work that could be performed for an individual with the same physical limitations discussed above, but with mental limitations such that the individual could only concentrate for two hours at a time. R. 59. The VE responded that Cuffie could still perform as a toll collector, parking lot attendant or in small product assembly. R. 60.

### 3. *Findings of the ALJ*

Following the prescribed five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Cuffie has not engaged in substantial gainful activity since November 5, 2009, the alleged onset date. R. 89. Cuffie does not dispute the ALJ's finding at step one.

At step two, the ALJ found that Cuffie had the following severe impairments: degenerative disc disease and adjustment disorder. R. 90. Cuffie does not dispute the ALJ's findings at step two.

At step three, the ALJ found that Cuffie did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 90. Cuffie does not dispute the ALJ's findings at step three.

Before reaching step four, the ALJ determined Cuffie's RFC, finding that Cuffie "has the [RFC] to perform light work as defined in 20 C.F.R. [§§] 404.1567(b) and 416.957(b) except she can only occasionally climb ramps and stairs, crouch, crawl and stoop, but she can frequently balance and kneel; she can walk and stand for 2 hours in an 8 hour workday; she should avoid moderate exposure to hazards; avoid concentrated exposure to extreme cold; she can maintain

concentration, persistence and pace for two hours at a time; she is limited to routine changes in the workplace and could respond to changes appropriately after instructed." R. 91. Cuffie disputes this finding.

At step four, the ALJ found that Cuffie was unable to perform past relevant work as a Certified Nurse's Assistant. R. 101. Cuffie does not dispute this finding.

At step five, the ALJ found that, based upon Cuffie's age, education, work experience and RFC, that there are jobs that exist in significant numbers in the national economy that Cuffie can perform. R. 101-02. Cuffie disputes this finding.

### C. Cuffie's Challenges to the ALJ's Findings

Cuffie contends that the ALJ's RFC determination that she has the capacity to perform sedentary work with certain restrictions is not supported by substantial evidence. Specifically, she argues that the ALJ erred by rendering an RFC determination that is inconsistent with a single opinion of her treating physician, Dr. Armstrong, and that is unsupported by the medical opinions in the record and failing to provide an adequate explanation for discounting the opinion. D. 12 at 8.

#### 1. The ALJ Did Not Err in her Analysis of the Medical Opinions

Cuffie argues that the ALJ should have made an RFC determination consistent with treating physician Dr. Armstrong's undated "Physical Residual Functional Capacity Questionnaire" and that the ALJ erred by improperly giving enhanced weight to other medical opinions by Dr. Armstrong and other physicians in making her RFC determination. When determining whether a person is disabled, the ALJ must consider all medical opinions together with other relevant evidence in the record. 20 C.F.R. § 416.927(b)-(c). The ALJ is not

"obligated automatically to accept [a treating physician's] conclusions." Guyton v. Apfel, 20 F. Supp. 2d 156, 167 (D. Mass. 1998). A treating physician's opinion is given controlling weight if the "treating source's opinion on the issue(s) of the nature and severity of [the patient's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the case record. Makuch v. Halter, 170 F. Supp. 2d 117, 124–25 (D. Mass. 2001) (alterations in original) (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2)). When the treating physician's opinion is not given controlling weight, the ALJ must determine the amount of weight to be given to the opinion based on factors that include the length of the treatment relationship and the frequency of examination; the nature and extent of the treatment relationship; whether the treating physician provides evidence in support of the opinion; whether the opinion is consistent with the record as a whole; whether the physician is a specialist in the field; and any other relevant factors such as the extent to which the physician is familiar with the other information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(d)(2). Although an ALJ must provide "good reasons" in her opinion for the weight she assigns to a treating source, Gagnon v. Astrue, No. 11–CV–10481–PBS, 2012 WL 1065837, at *5 (D. Mass. Mar. 27, 2012) (quoting 20 C.F.R. § 404.1527(d)), the ultimate determination of disability is for the ALJ, not the treating physician(s), to decide. 20 C.F.R. § 404.1527(d)(1) (providing that "[a] statement by a medical source that [the claimant is] 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine that [the claimant is] disabled"). The ALJ must also use these factors to determine the weight given to any other medical opinion. 20 C.F.R. § 404.1527(c)(1)–(6).

The ALJ is also required to consider all of the medical evidence in the record when making her RFC determination. Id. § 416.927(c). An "ALJ can consider all the evidence without directly addressing in [her] written decision every piece of evidence submitted by a party." Ramos-Birola v. Astrue, No. 10–cv–12275–DJC, 2012 WL 4412938, at *20 (D. Mass. Sept. 24, 2012) (quoting N.L.R.B. v. Beverly Enters.–Mass., Inc., 174 F.3d 13, 26 (1st Cir. 1999) (internal quotation mark omitted)); see also Miller v. Astrue, No. 99–CV–12018–RBC, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011) (noting that "[t]here is no requirement that an ALJ discuss every bit of evidence in the record when penning [her] decision [and] [t]he failure to mention a particular record does not evince a failure to consider it"). As discussed below, the ALJ properly considered all of the medical evidence in the record and the factors when determining Cuffie's RFC.

a.   Dr. Kelly Armstrong

The ALJ stated that she considered Dr. Armstrong's opinions stated in the Questionnaire and gave them "little weight," listing her reasons for doing so, which are consistent with the factors outlined in 20 C.F.R. § 404.1527(c). R. 97. Dr. Armstrong was Cuffie's primary care provider and was asked by Cuffie's attorney to complete a "Physical Residual Functional Capacity Questionnaire" based upon her treating relationship with Cuffie. R. 618-622. Dr. Armstrong's undated Questionnaire recites Cuffie's diagnosis of L5-S1 discogenic low back pain with a prognosis of "good, but may need fusion." R. 618. Dr. Armstrong stated that Cuffie's pain was "sharp," "severe," "prevented work since June 25, 2009" and was severe enough to interfere with Cuffie's capacity to work "constantly." R. 619. Dr. Armstrong stated that Cuffie could walk one-half of a city block without pain, could sit for 45 minutes without getting up,

stand for 30 minutes at one time before needing to move and sit, stand or walk for 2 hours total in an eight hour work day. R. 618-19. Dr. Armstrong further opined that Cuffie would need five minute breaks every thirty minutes and take one day off per month. R. 619. Dr. Armstrong added that Cuffie could rarely lift more than ten pounds and never lift any more than that. Id. Dr. Armstrong also indicated that Cuffie could never twist, stoop, crouch, squat, or climb ladders or stairs. R. 620-21. In addition, Dr. Armstrong noted that Cuffie's psychological conditions of depression and anxiety further inhibited her physical condition. Id. In addition to the Questionnaire, the ALJ also considered Dr. Armstrong's numerous reports of "ongoing low back pain." R. 96. In particular, the ALJ focused on Cuffie's reports of "10/10" pain to Dr. Armstrong, at least some of which Dr. Armstrong discounted. Id.

The ALJ provided three distinct bases for rejecting the Dr. Armstrong's opinions that she provided in the Questionnaire. First, the ALJ considered other opinions offered by Dr. Armstrong to support her conclusion that Cuffie was not in as much pain as she reported to be. In particular, the ALJ focused on the inconsistencies between Dr. Armstrong's prognosis in the Questionnaire as compared to the position she took in various other notes, some of which questioned the veracity of Cuffie's self-reporting of symptoms. R. 97. Specifically, the ALJ found that in Dr. Armstrong's December 7, 2010 note, Dr. Armstrong doubted that Cuffie was actually in 10/10 pain, especially in light of the fact that, according to Armstrong, Cuffie "agily move[d] about on the exam table without guarding." Id. Dr. Armstrong's responses to the Questionnaire were also inconsistent with her findings in earlier reports that there were no apparent structural differences after the June 25, 2009 accident as compared with examinations conducted prior to the accident, when Cuffie was still working. R. 608. This further casts doubt

on whether the June 25, 2009 accident was, in fact, disabling and supports the ALJ's decision to discount the Questionnaire. Coggon v. Barnhart, 354 F. Supp. 2d 40, 51 (D. Mass. 2005) (citing Shaw v. Sec'y of Health and Human Servs., No. 93–2173, 1994 WL 251000, at *3 (1st Cir. June 9, 1994) (per curiam) (noting that "[w]hen a treating doctor's opinion is inconsistent with other substantial evidence in the record, the requirement of 'controlling weight' does not apply")). The ALJ therefore considered the Questionnaire's consistency with other evidence and the record and supportability in light of other evidence in the record. 20 C.F.R. § 404.1527(c)(3)-(4).

Cuffie alleges that the ALJ ignored medical evidence and "substitute[d] [her] own views for an uncontroverted medical opinion." D. 19 at 12 (quoting Rose v. Shalala, 34 F.3d 13, 18 (1st Cir. 1994)). However, as is evident from the discussion above, the ALJ addressed the Questionnaire directly, pointing out the inconsistencies between the opinion expressed in the Questionnaire and other reports by Dr. Armstrong. D. 97. Again, evaluating the consistency of this opinion with other opinions in the record was well within the ALJ's discretion. 20 C.F.R. 404.1527(c)(4). For this very reason, the opinions that Dr. Armstrong expressed in the Questionnaire were not "uncontroverted" at all, but at least arguably inconsistent with the same physician's opinions.

Dr. Armstrong's opinions in the Questionnaire were also inconsistent with the findings of other treating physicians. Dr. Davis, on three separate occasions, found that Cuffie was able to return to work with restrictions consistent with the ALJ's findings. R. 328, 333, 338. In addition, Dr. Davis reported that Cuffie's reports of her pain were inconsistent with her MRI results and expressed doubt at the severity of Cuffie's back pain. D. 330. Dr. Davis also

suggested that Cuffie's restrictions on her mobility were self-imposed. Id. Similarly, post-operative reports from Dr. McKay also indicate that Cuffie made substantial progress after her back surgery and suggested that any restrictions on mobility may have been self-imposed. R. 695. Schwartz, meanwhile, reported that Cuffie was engaged in an "aggressive" exercise program, which provided the ALJ with additional evidence in support of her conclusion that Cuffie had residual functional capacity to return to work. Each of these reports is inconsistent with Dr. Armstrong's responses to the Questionnaire, further bolstering the ALJ's decision to discount the Questionnaire.

Second, the ALJ concluded that Dr. Armstrong exaggerated Cuffie's limitations in the Questionnaire with the intent of assisting her in her application for disability benefits. R. 98. Alternatively, the ALJ posited that Cuffie was insistent that Dr. Armstrong provide Cuffie with favorable notes to support her application for benefits. R. 98. The ALJ found this considerably more likely "where the opinion in question departs substantially from the rest of the evidence of the record, including the physician's own records." Id.

Cuffie alleges that the ALJ improperly made credibility judgments about Dr. Armstrong and did not provide "specific legitimate reasons for rejecting the treating physician's opinion." D. 12 at 18 (citing Castellano v. Sec'y of Health and Human Servs., 26 F.3d 1027, 1029 (10th Cir. 1994)). However, as discussed above, the ALJ clearly laid out the inconsistencies in Dr. Armstrong's opinions and explained the reasons that she rejected one, though certainly not all, of Dr. Armstrong's opinions. It was entirely proper for the ALJ to give diminished weight to the Questionnaire as a result of the aforementioned inconsistencies. Shaw, 1994 WL 251000, *4.

Third, the ALJ concluded that Dr. Armstrong's limitations were "in conflict with the

limitations provided by the DDS reviewing physicians," noting that she could "reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if that evidence consists of reports from non-treating doctors." R. 98 (quoting Castro v. Barnhart, 198 F. Supp. 2d 47, 54 (D. Mass. 2002)). In light of the foregoing, the ALJ properly considered the relevant factors in determining to give "little weight" to certain of Dr. Armstrong's medical opinions.

Here, Cuffie alleges that the ALJ did not cite specifically to reports from non-treating physicians whose opinions the ALJ gave greater weight. Nevertheless, the ALJ "is not required to expressly refer to each document in the record piece-by-piece." Gregory v. Astrue, No. 11-CV-30281-KPN, 2012 WL 5899235, at *5 (D. Mass. Oct. 25, 2012) (quoting Rodriguez v. Sec'y of Health and Human Servs., No. 90-1262, 1990 WL 151380, at *1 (1st Cir. Sept. 27, 1990) (per curiam)). Indeed, a review of the DDS assessments to which the ALJ alluded indicates findings inconsistent with Dr. Armstrong's findings in the Questionnaire. For example, Dr. Erik Purins found in his assessment that Cuffie could frequently lift ten pounds, occasionally lifting twenty, stand or walk for six hours in an eight hour work day, sit for six hours in an eight hour work day, push or pull, frequently climb stairs, balance, kneel or crawl and occasionally climb ladders, stoop or crouch. R. 340-41. Dr. Malin Weeratne made similar findings. R. 424-25. Hearing officers are permitted to ascribe weight to the opinions of state agency physicians. Coggon, 354 F. Supp. 2d at 54. Therefore, not only was it not error for the ALJ to fail to cite to the record in discussing the DDS assessments, but the DDS assessments themselves were also consistent with the ALJ's findings.

## V. Conclusion

Based on the foregoing, the Commissioner's motion to affirm, D. 18, is GRANTED and Cuffie's motion for judgment on the pleadings, D. 11, is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge
